IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 17, 2021 Session

## STATE OF TENNESSEE v. VANASSA HURST

**Appeal from the Criminal Court for Claiborne County**
**No. 2016-CR-2303    E. Shayne Sexton, Judge**

_____

### No. E2020-00980-CCA-R3-CD

_____

The Defendant, Vanassa Hurst, was convicted by a Claiborne County Criminal Court jury of first degree felony murder and second degree murder. *See* T.C.A. §§ 39-13-202(a)(2) (2019) (subsequently amended), 39-13-210(a)(1) (2014) (subsequently amended). The trial court imposed a life sentence for first degree murder, ordered a sentence of nineteen years for second degree murder, and merged the second degree murder conviction into the first degree murder conviction. On appeal, the Defendant contends that (1) the trial court erred in denying her motion to suppress her pretrial statements and (2) the evidence is insufficient to support her convictions. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Timothy P. Webb (on appeal and at motion for a new trial), Duff, Tennessee; and Edward L. Holt, Jr. (at trial), Knoxville, Tennessee, for the Appellant, Vanassa Hurst.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jared Effler, District Attorney General; Graham Wilson and Matthew McClung, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to the November 27, 2015 homicide of Hershel Gulley, who died from bleeding in the brain due to a laceration injury to the vertebral artery, which the evidence showed resulted from a violent beating. The Defendant was indicted with other individuals but was tried separately. The State's theory at the trial was that the Defendant and Kayla Partin robbed the victim. The State also theorized that the Defendant fabricated a story that the victim attempted to rape her in order to gain her uncle,

Tommy Hurst's, assistance in fatally beating the victim in order to accomplish the robbery. The Defendant's theory was that she had been involved in the robbery of the victim but that, unbeknownst to her, the victim followed her to Mr. Hurst's house, and that Mr. Hurst fatally assaulted the victim without the Defendant's assistance or participation.

## Hearing on Motion to Suppress

The record reflects that the Defendant filed a motion to suppress her pretrial statements, although the motion has not been included in the appellate record. At the suppression hearing, the trial court stated that the Defendant was "asking to suppress statements made by the defendant to law enforcement during the course of four interviews." Defense counsel added, "The basis of the motion . . . is that the arrest initially was illegal." When asked by the court if the defense theory was that "the fruit of the poisonous tree began at the time of the arrest," defense counsel said, "Yes, your Honor." We note that despite the defense's apparent effort to suppress the evidence from four statements, the suppression hearing evidence contained proof of one statement, which was given at the Clairfield Fire Department in the early morning hours of November 27, 2015, following the victim's death.

Tara Baird testified for the defense that in November 2015, she lived in Frakes, Kentucky, which she said was "[p]robably three minutes" from the Tennessee/Kentucky border. She said that around 1:00 a.m. on November 27, 2015, the Defendant, who was Ms. Baird's cousin, and Ms. Partin came to her house. Ms. Baird said that when the Defendant arrived, the Defendant repeatedly said, "[I]t was real bad." Ms. Baird said that the Defendant later said, "[T]here was a man laying in her mamaw's yard" and that the Defendant eventually identified the victim by name. Ms. Baird said that the Defendant did not state she had been dropped off at Ms. Baird's house by the police, that the Defendant did not state she had reported a rape, and that the Defendant stated a man was "after her."

Ms. Baird testified that Ms. Partin held Ms. Partin's arm. Ms. Baird said that Ms. Partin asked for water to drink and that while Ms. Baird got the water, Ms. Partin left. Ms. Baird said the Defendant made telephone calls to try to find someone to help Ms. Baird because "she [was] afraid that she was gonna bleed to death."

Ms. Baird testified that the Defendant stayed at Ms. Baird's house for about one hour and left when a uniformed, armed law enforcement officer "come and got her." Ms. Baird said the officer arrived in a marked police SUV and thought the officer was from Tazewell, Tennessee. She said the SUV's blue lights were not activated. Ms. Baird said that the officer asked to speak to the Defendant, that Ms. Baird went outside with the Defendant, and that the officer said he needed to take the Defendant "to her mamaw's to question her." Ms. Baird said the Defendant agreed to go and left with the officer. Ms. Baird said that the officer did not handcuff or frisk the Defendant and that he "helped guide

[the Defendant] down a hill." Ms. Baird said the Defendant sat in the backseat of the police SUV when she left. Ms. Baird did not think the Defendant had a choice about leaving with the officer and said his instruction to the Defendant "most likely" sounded like a command. Ms. Baird said the officer did not tell the Defendant that the Defendant was under arrest or that he was investigating criminal activity. Ms. Baird said her and the Defendant's "mamaw" lived in Tennessee.

Claiborne County Sheriff's Deputy Blake Laws testified that he was on duty on the night of November 26 and 27, 2015, and that he was dispatched to Tracy Branch Road in Clairfield regarding a reported rape. He said that he could not find the complainant at first but eventually located the Defendant, who was walking on Tracy Branch Road. He testified that she stated she had been picked up by a man who drove a dark Explorer SUV, that the man drove her a short distance before pulling over and asking what she was going to do for him for the ride, and that the man grabbed her shirt. Deputy Laws said the Defendant stated that an altercation ensued when she tried to get away from the man, that she sprayed him with mace, that she got out of the SUV, and that the man drove away. Deputy Laws said the Defendant stated she did not know the man's identity.

Deputy Laws testified that Detective Jason Henegar arrived shortly after he talked to the Defendant. Deputy Laws said Ms. Partin emerged from the woods with a large cut on her forearm near her wrist. He said he called EMS, who came to the scene and bandaged Ms. Partin's wound.

Deputy Laws testified that when he asked the Defendant if she knew Ms. Partin, the Defendant "shook her head no like she didn't know who she was and then as soon as [Ms. Partin] came out [of the woods], she started talking to [the Defendant] asking her . . . . or telling her that she heard everything that happened and acting like she knew . . . exactly who she was." When asked if the Defendant's and Ms. Partin's "stories" were consistent, he said, "No." He said that neither the Defendant nor Ms. Partin had transportation and that he gave them a ride "maybe a mile or so from where we was at, down Tracy Branch Road to a residence." He said he did not see a sign indicating that he had driven out of Tennessee and had entered Kentucky.

Deputy Laws testified that after he dropped off the Defendant and Ms. Partin, he responded to a call regarding an unconscious or unresponsive man lying in a yard on Tracy Branch Road. He said that when he arrived at the address, he found the victim "laying in the yard on his back dead." Deputy Laws said it appeared that someone had "gone through" the victim's pockets. Deputy Laws said he called Detective Henegar, who arrived within a few minutes. Deputy Laws said that Detective Henegar told him to pick up the Defendant from the house where he had left her. Deputy Laws agreed he picked up the Defendant at the house around 1:56 a.m. Deputy Laws said that he had no intent to arrest the Defendant when he went to the house and that he went to get the Defendant because Detective Henegar

-3-

wanted to speak with her regarding "this incident." Deputy Laws said Detective Henegar had information that the Defendant "had been staying at" the house where the victim was found in the yard. Deputy Laws said that he had the Defendant sit in the back of his patrol SUV. He said, "I always put any female in the back or – anybody in that matter in the back." He said he did this "to keep from allegations being made." He acknowledged that placing a female in the backseat was "controlling the female individual." He did not recall how long the Defendant remained in the SUV while he was at the scene but said he had been there "quite some time" and that she remained in the back of the SUV until Sergeant Henegar took the Defendant to the fire department in Clairfield for an interview. Deputy Laws said he remained at the scene for about one hour, at which time he went to a church, which other evidence showed was Tracy Branch Church. He said he did not participate in the Defendant's interview. When asked why he would have left the Defendant in the SUV that night, he said it had been cold. He thought the Defendant had worn a jacket or "little pullover sweatshirt." He acknowledged that the Defendant would have been unable to leave the SUV on her own because the SUV had "automatic locks."

Deputy Laws testified that in November 2015, he had worked for the Claiborne County Sheriff's Department for one and one-half years. He said that he was from Harrogate, in Claiborne County, but was "[n]ot really" familiar with Clairfield, the area where the relevant events in this case occurred. He said he knew where the Tennessee/Kentucky border was on Highway 90 but not where it was on Tracy Branch Road. He acknowledged that his jurisdiction as a law enforcement officer was Claiborne County, Tennessee, and that he was not certified as a law enforcement officer in Kentucky. He said that if he were dispatched to a call in Clairfield, the fastest route involved going through Middlesboro, Kentucky, unless he were "down on the Campbell County[, Tennessee] line."

Claiborne County Sheriff's Detective Jason Henegar testified that he responded to a call regarding an alleged rape on November 29, 2015.[1] He agreed that when he arrived, Deputy Laws was already there. Detective Henegar said he spoke with the Defendant, who provided an account that did not include a rape allegation. He stated that the Defendant said she had accepted a ride from a man in a dark-colored SUV, that he "pulled over into a wide area," that he asked what she was going to do in exchange for his giving her a ride, and that she struggled with the man. Detective Henegar stated that the Defendant said her shirt was stretched in the struggle, that she punched and kicked the man, that she sprayed the man with mace, and that she got out of the SUV.

Detective Henegar testified that Ms. Partin came out of the woods, was "falling down in the road," and had a cut on her hand. He said Ms. Partin tried to speak but that

---

[1] Other evidence shows that the call was received on the night of November 26 and 27, 2015.

-4-

the Defendant tried to talk over Ms. Partin and seemed not to want Ms. Partin to speak. He said Ms. Partin acted as if she and the Defendant had been together but that the Defendant "was saying that she hadn't seen [Ms. Partin], asking where she came from." He said the Defendant's and Ms. Partin's stories were inconsistent and "very suspicious."

Detective Henegar testified that after he left the scene, he drove on Tracy Branch Road looking for the dark SUV the Defendant had reported but did not find it. He said that after he reached Highway 90, he received a second dispatch call regarding a fight or disturbance in front of a house on Tracy Branch Road. He said that when he arrived at the house, Deputy Laws was present and that the body of a deceased man lay in the yard at the front corner of the house. Detective Henegar said that he spoke to Tommy Hurst, who was on the porch, and that Mr. Hurst's mother, Mr. Hurst's grandmother, and a man were inside the house.

Detective Henegar testified that he told Deputy Laws to return to the location where Deputy Laws had dropped off the Defendant and to pick her up. Detective Henegar said he thought the deceased person in the yard was connected to the Defendant. He noted the suspicious nature of the Defendant's and Ms. Partin's stories, information Mr. Hurst provided about the Defendant's being Mr. Hurst's niece, and information from Mr. Hurst that the Defendant had been staying at the house but had not been there for two to three days. Detective Henegar agreed that no basis existed to charge the Defendant with a crime at the time Deputy Laws picked her up.

Detective Henegar testified that after Deputy Laws returned with the Defendant, she sat in the backseat of a police SUV for at least forty-five minutes and "quite possibly longer" while he assisted other officers "with the scene." Detective Henegar said he did not think of getting the Defendant out of Deputy Laws' police SUV because he was "busy with the scene" and because it was cold. He said that he went to the fire department in Clairfield and was present when Captain Honeycutt conducted the Defendant's first interview. Detective Henegar was unsure but thought he was the officer who took the Defendant to the fire department. He thought that Captain Honeycutt advised the Defendant of her *Miranda* rights and that "the original alleged rape call" was discussed. Detective Henegar did not recall the details of the interview. When asked about the number of doors the room had, he recalled it had one door. He recalled that he sat on a couch and thought the Defendant and Captain Honeycutt sat in chairs at a table. Detective Henegar did not recall whether the Defendant was handcuffed or stood and moved around during the interview. He thought she was given the opportunity to smoke a cigarette. He did not recall the Defendant's leaving the fire department after the statement and said he thought he "may have left the fire department first." He thought the Defendant was not charged with a crime until a couple of days after the interview at the fire department.

After receiving the evidence, the trial court found that although a detention occurred, it was not unlawful. The court noted that "no real claim of an arrest" had been made. The court noted that, although the Defendant's having to sit in the back of the SUV may have been an "inconvenience," there had been no showing that the Defendant "protested or made some aversion" to the situation. The court took judicial notice of the geographic area involved and found that "bringing in a Kentucky officer . . . might be good, it's gonna be hard, and . . . some of these are time sensitive moves made by law enforcement[.]" Thus, the court denied the motion to suppress, stating, "I find that there is no basis to suppress anything beyond the detaining of the defendant going all the way out I think what law enforcement did was proper, and . . . these items will come into proof."

## Trial

At the trial, Carrie Fuson testified that the Defendant came to her house on Thanksgiving night, 2015, around 11:00 or 11:30 p.m., stated she "had almost been raped, and asked to come inside and to use Ms. Fuson's telephone. Ms. Fuson described the Defendant as not appearing "put together, . . . kind of frantic, yelling, wanting to come in, wanting to use the phone." Ms. Fuson said the Defendant did not appear to be injured or have blood or bruises on her. Ms. Fuson said the Defendant "was pulling at [the Defendant's] shirt" but that the shirt did not appear to be ripped. Ms. Fuson said she did not allow the Defendant to come inside but that she allowed the Defendant to wait on the porch. Ms. Fuson said she called 9-1-1 to report the Defendant's attempted rape allegation. Ms. Fuson said she saw another person outside who appeared to be female but that it was dark. Ms. Fuson said she heard a man's voice but did not see a man. Ms. Fuson indicated the location of her house on a map, and the map was received as an exhibit. She indicated the location of Tracy Branch Church on the map and said the church was about a thirty-second drive from her house. Ms. Fuson said that when the Defendant left Ms. Fuson's house, the Defendant traveled in the opposite direction of the church and of the Kentucky/Tennessee border.

Claiborne County Sheriff's Detective Jason Henegar testified that on November 26 and 27, 2015, he was on duty as a patrol sergeant when he responded to a call involving the Defendant around 11:00 p.m. on November 26 or 12:00 a.m. on November 27. He said that when he arrived on Tracy Branch Road, he saw the Defendant talking to Deputy Blake Laws. Detective Henegar said the Defendant reported that she had been involved in a physical struggle with a man driving a dark, possibly black SUV who had given her a ride and asked "what she was gonna give him for giving her a ride." Detective Henegar said the Defendant claimed to have kicked, punched, and sprayed the man with mace after he grabbed the front of her shirt. Detective Henegar said that he saw no injuries, blood, mud, or grass stains, but that the Defendant's shirt was "stretched out and down" and possibly was torn.

-6-

Detective Henegar testified that as he talked to the Defendant with Deputy Laws and two EMS workers, he heard a female voice yelling behind him. He said that, eventually, Kayla Partin emerged from a wooded area. Detective Henegar said that the Defendant "initially acted confused about who [Ms. Partin] was." He said that Ms. Partin acted as if she knew the Defendant, that Ms. Partin attempted to have a conversation with the Defendant "about something that had happened prior to our contact with them," and that the Defendant seemed not to want Ms. Partin to talk. He said the women "eventually began talking about knowing each other, but it took a little while." He said he concluded that the women knew each other and had "probably been together involved in something prior to our contact with them." Detective Henegar said Ms. Partin had a bloody cut on one of her hands.

Detective Henegar testified that the Defendant did not allege that she had been raped but reported the man in the SUV made advances toward her, which led to the physical altercation. He described the Defendant as "fairly calm." He said he determined the rape allegation was not credible. Detective Henegar said he told Deputy Laws to complete an incident report regarding the Defendant's allegations and to transport the Defendant and Ms. Partin "wherever . . . they chose to go to."

Detective Henegar testified that he left the scene on Tracy Branch Road and that after he had driven a few miles, he received a call regarding an unresponsive man found in a yard on Tracy Branch Road. He said he suspected a connection between the earlier call involving the Defendant and the second call because "the story that we got from [the Defendant] and Ms. Partin just wasn't making any sense." He noted that the two calls related to proximate locations and were received within a short period of time.

Detective Henegar testified that he returned to Tracy Branch Road and that he found Deputy Laws at a scene where a body lay near the porch of Tommy Hurst's house. Detective Henegar identified a photograph of the body, and the photograph was received as an exhibit. Detective Henegar said he spoke with Mr. Hurst and learned that other individuals were inside the house. Detective Henegar said Mr. Hurst stated that he was the Defendant's uncle, that she had been staying at his house "not the previous night but prior to that," that Mr. Hurst heard noise outside, that Mr. Hurst went to a door and turned on a porch light, and that Mr. Hurst saw three women and two or three men kicking the victim and going through the victim's pockets. Detective Henegar said Mr. Hurst stated that when Mr. Hurst made his presence known, the people ran in different directions. Detective Henegar said he secured the scene and called for investigators to respond. He said he suspected the Defendant and Ms. Partin were somehow connected to the body and that he told Deputy Laws to return to the house where Deputy Laws had dropped off the Defendant and Ms. Partin and to bring them to the scene. Detective Hurst said that Mr. Hurst's house and the location on Tracy Branch Road where he had spoken with the Defendant and Ms. Partin were close and within walking distance of one another.

Detective Henegar testified that Deputy Laws later returned to the scene with the Defendant but that Ms. Partin was no longer at the house. Detective Henegar agreed that he was present when Detective Honeycutt advised the Defendant of her *Miranda* rights at 4:14 a.m. and interviewed her. Detective Henegar identified the Defendant's written waiver of her *Miranda* rights, which was received as an exhibit.

Detective Henegar identified footage from the scene which was recorded by his body camera, and the recording was received as an exhibit and played for the jury. The recording was consistent with Detective Henegar's testimony about the initial call to Tracy Branch Road. Regarding a portion of the recording in which Ms. Partin stated that she had been worried because the Defendant "left with that crazy a-- drunk," Detective Henegar said Ms. Partin's statement had been inconsistent with the Defendant's account of events.

Claiborne County Sheriff's Deputy Carl Monzingo testified that he had been acquainted with the victim before the victim's death and that the victim limped, walked slowly, and had limited use of his left hand and left arm. Deputy Monzingo said the victim's impairments were consistent with those a person might experience from a stroke. Deputy Monzingo identified a photograph of the victim taken before the victim's death, and the photograph was received as an exhibit.

Deputy Monzingo testified that he arrived at Mr. Hurst's house around 1:30 or 2:00 a.m. He said that he had not known "about the prior interaction of [the Defendant] and [Ms. Partin] earlier in the night" but that he had known that Mr. Hurst and the Defendant were related. Deputy Monzingo said he was notified that a vehicle had been found at Tracy Branch Church, that he went to the church, and that he recognized the vehicle as belonging to the victim. Deputy Monzingo agreed that the church was in Kentucky.

Tara Baird, the Defendant's cousin and Mr. Hurst's daughter, testified that she lived in Hatfield Gap, Kentucky, which she said was about four miles from Clairfield, Tennessee. Ms. Baird said that she had been at a Thanksgiving dinner at her "mamaw's" in Clairfield on November 26, 2015, which she said the Defendant had attended and had left around 7:00 p.m. Ms. Baird said she and unidentified others tried to "keep [the Defendant] home" because they "[knew] what she was going to do" but that the Defendant left anyway. Ms. Baird said the Defendant came to Ms. Baird's door around 1:00 a.m. on November 27. Ms. Baird said that Ms. Partin was with the Defendant, that the Defendant stated, "It was real bad," and that Ms. Baird did not understand what had happened. Ms. Baird said that the Defendant's shirt was torn, that the Defendant's bra was visible, and that Ms. Baird gave the Defendant another shirt to wear. Ms. Baird said the Defendant had worn tan cloth shoes with light, bendable rubber soles. Ms. Baird said the Defendant's shoes and pants legs were muddy. Ms. Baird did not see blood on the Defendant.

Ms. Baird testified that the Defendant "first acted like someone was after her," that the Defendant stated a man had tried to pull her into a vehicle. Ms. Baird said her husband went outside to see if he could find anyone outside. Ms. Baird said the Defendant made telephone calls to Ms. Partin's father and Chris Daniels because the Defendant was concerned Ms. Partin "was gonna bleed to death" from a cut on Ms. Partin's arm. Ms. Baird said that the Defendant said she had been waiting on Ms. Partin's father to meet her but that he had not shown up and that Ms. Partin had planned to promise the victim oral sex in exchange for drugs. Ms. Baird said that the Defendant stated that while Ms. Partin "was doing that," the victim grabbed the Defendant and asked what she was going to do and that the Defendant and Ms. Partin "kind of just got the idea just to beat him up and rob him." Ms. Baird said the Defendant claimed she and Ms. Partin had planned to exchange sexual favors for drugs and "just decided all of a sudden" to rob and assault the victim. Ms. Baird said the Defendant stated she and Ms. Partin took the victim's cell phone, keys, and wallet. Ms. Baird said the Defendant showed her the keys and said they were the victim's. Ms. Baird said the Defendant stated that she kicked the victim and "done the final blow." Ms. Baird said the Defendant stated she had discarded a pink jacket near the scene. Ms. Baird said that the Defendant asked for water and that when Ms. Baird returned with the water, Ms. Partin was gone.

Ms. Baird testified that at some point, the Defendant told her "there was a dead man out there." Ms. Baird said the Defendant stated she had reported to 9-1-1 that the Defendant had been raped. Ms. Baird said the Defendant claimed she had fabricated this story based upon an alleged rape which occurred one year earlier. Ms. Baird said the Defendant stated of the prior rape that it "was all just a lie."

Ms. Baird testified that after the Defendant left Ms. Baird's house, Ms. Baird had her husband provide law enforcement with the Defendant's shirt and the keys the Defendant had identified as the victim's, both of which the Defendant had left at Ms. Baird's house.

Claiborne County Sheriff's Detective Bradley Duncan testified that he was the lead detective in the victim's homicide. He photographed the scene and collected evidence. He identified photographs of Mr. Hurst's house and of the victim's body on the yard, and the photographs were received as exhibits. Detective Duncan said the victim's face showed obvious trauma. Detective Duncan said the victim lay face up with his feet three to five feet from the base of a wheelchair ramp outside the house. Detective Duncan said the ground near the body was damp, that a bath towel was near the victim's head, and that an open condom wrapper with a partially removed condom lay a short distance from the victim's left shoulder. Detective Duncan said that he did not note any signs of a struggle but that some blood was "around the body in the grass" and near the condom wrapper. Detective Duncan identified the condom wrapper, which was received as an exhibit. He said DNA analysis of the wrapper later showed the presence of DNA profiles of the victim

and Ms. Partin. He identified a pink jacket that was found "at a garage on Tracy Branch Road." He estimated that the garage was possibly "a few tenths of a mile" from the homicide scene. He said the jacket contained a car title for a four-door 2001 Chevrolet that had been assigned from Myrtle May Lay to the Defendant. The title was received as an exhibit. Detective Duncan agreed that the Defendant stated in the recording from Detective Henegar's body camera that she had worn a pink jacket.

Detective Duncan identified a photograph of the rear of the victim's Ford Explorer at Tracy Branch Church, and the photograph was received as an exhibit. Detective Duncan said handprints were visible on the victim's SUV, a tail light was broken, and items that appeared to be from the SUV were scattered in the church's parking lot. He noted that pieces from the broken tail light sat on the bumper and on the ground. He said other officers recovered an envelope containing methamphetamine from the parking lot. He said that a pair of mangled wire-framed glasses were found in the parking lot close to the rear passenger-side door and that another officer who was familiar with the victim identified the glasses as being consistent with those worn by the victim. The glasses and a detached lens were received as exhibits. He said a second pair of glasses was found in grass "on the far side" of the SUV and that although he was not certain, he believed these glasses belonged to Ms. Partin. He said that a floor mat was found underneath the SUV and that it was consistent with the other mats inside the SUV. He said the mat contained a substance that testing later showed was the victim's blood. The floor mat was received as an exhibit. Detective Duncan said a credit card with the victim's name was found in the parking lot in front of the SUV. A photograph of the credit card at the scene and the credit card were received as exhibits. Detective Duncan said a condom wrapper was found at the edge of the grass toward the front of the SUV. The wrapper was received as an exhibit.

Detective Duncan testified that at 5:40 a.m. on November 27, 2015, Ms. Baird's husband, Dean Baird, arrived at the scene with a trash bag containing keys that were later used to move the SUV to the county garage for processing, and the Defendant's purple shirt. Detective Duncan said the shirt was consistent with the shirt the Defendant wore in the video footage from the body camera. The shirt was received as an exhibit. Detective Duncan said the keys and the SUV were released to the victim's family after the SUV was processed for evidence. Detective Duncan identified a photograph of the driver's side rear passenger floorboard of the SUV, which showed a Bud Light beer bottle. He said a fingerprint on the bottle was determined to be from the Defendant's right index finger. The bottle was received as an exhibit. Detective Duncan said that a beach towel was recovered from the SUV and that testing later revealed the presence of the victim's blood but no evidence of capsaicin, an irritant used in mace and pepper spray. Detective Duncan acknowledged that the church where the SUV was found was in Kentucky and that no Kentucky law enforcement officials were involved in the investigation at the church.

Detective Duncan testified that he was present for the statement the Defendant gave on November 27, 2015, at around "5:30."[2]  He said he prepared a written statement based upon what she told him and that she signed the statement.  He identified the statement, which was received as an exhibit and read to the jury.  In the statement, the Defendant said the following:  She rode to the church on Tracy Branch Road the previous night with the victim, "B.J.," and Ms. Partin.  "Megan, Adam and Michael were also there in a black Camaro."  At some point, Ms. Partin sprayed the victim with pepper spray.  B.J. dragged the victim out of the SUV, and the Defendant hit the victim "no more than twice" with a beer bottle.  Adam, Megan, and Michael left, and the Defendant left on foot.  The Defendant went to a house and asked them to call her "mamaw" and the police because she and a friend were in trouble.  She thought she left this house and went to Mr. Hurst's house.  She told Mr. Hurst that the victim had tried to rip off her clothes.  She said she made this statement "out of spite" because the victim "laid his hands on" her.  Ms. Partin said the victim was pursuing them.  The Defendant thought the victim wanted his wallet and keys.  The Defendant said either she or Mr. Hurst killed the victim.  She stated she kicked him in the chest and hit the victim's back with a mop stick.  She said Mr. Hurst tackled the victim and kicked the victim's legs and thighs.

Detective Duncan testified that the police obtained a search warrant for Mr. Hurst's house and that they recovered the mop and a pair of size 12 "Doctor Martin" boots that belonged to Mr. Hurst.  Detective Duncan said the shoes had been found outside the house in woods "within throwing distance," or about twenty-five to thirty yards from the house.  Detective Duncan said the shoes were recovered after Mr. Hurst identified their location.  Detective Duncan said that no fingerprints were recovered from the mop and that no human blood was found on the boots.

Detective Duncan testified that DNA samples were collected from Mr. Hurst, the Defendant, Ms. Partin, and Brandon Partin.  Detective Duncan said a DNA sample was collected from the victim at the forensic center.  The DNA samples from these individuals were received as exhibits.  A timeline of events for November 26 and 27, 2015, was received as an exhibit.  Photographs of the victim's face taken at the scene were received as exhibits.  Detective Duncan said the victim's wallet was never recovered in the investigation.

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Charly Castelbuono, a forensic biology expert, testified that she analyzed a car floor mat and a towel that were collected as evidence and submitted to the TBI Laboratory.  She said each item contained a DNA profile that matched the victim.  She said a second DNA profile from the towel was inconclusive.  Referring to the condom and wrapper collected near the

---

[2] Detective Duncan did not specify whether the statement was taken at 5:30 a.m. or 5:30 p.m.  The written statement reflects that it was signed by the Defendant and Detective Duncan at "5:30 p."

victim's body, she said her analysis showed a mixture of DNA from the victim and Ms. Partin on the wrapper.

Federal Bureau of Investigation employee Cody Rowlett, an expert in latent fingerprint examination, testified that he had been employed previously by the TBI as a special agent forensic scientist. He said that during his employment with the TBI Laboratory, he tested items related to this case. His report was received as an exhibit. Regarding the beer bottle recovered from the victim's SUV, Mr. Rowlett said he identified a latent fingerprint on the bottle as being that of the Defendant's right index finger. He said other items he examined did not contain identifiable latent prints.

Darinka Mileusnic-Polchan, M.D., an expert in forensic pathology, testified that she performed the autopsy. She said that injuries to the victim's head and neck caused his death and agreed he suffered at least thirty-seven blows to his body. She said the cause of death was subarachnoid hemorrhage due to a vertebral artery laceration.

Dr. Mileusnic-Polchan testified that the victim had been 66″ tall and had weighed 184 pounds. She noted blood on his clothing, particularly on his sweatshirt and hood near the head and neck area. She said most of his injuries, including the most severe, were in his head and neck area. She identified thirty-seven injuries, fourteen of which were in the head and neck area. She noted pattern bruising that was consistent with trauma from an object, with the injury being about one and one-half inches in size. She said the contusions of this nature could have been inflicted with an elongated object or from heavy blunt force trauma. She noted a laceration and other injuries that were consistent with blunt force trauma. She said the victim's jaw, orbital bone, skull, arm, thumb, five ribs, and two cervical vertebrae were fractured. She noted a significant hemorrhage of the brain. She noted a laceration of the "ear fin," which she said was consistent with a high velocity impact from a relatively heavy object. She said his hyoid bone in his neck was fractured and he had a line or ribbon of bruising around his neck. She identified areas of the head and neck which sustained at least fourteen blows. She noted the presence of injuries to the neck that were consistent with impact and strangulation or use of a choke hold. She saw signs of direct trauma to both sides of the head. She noted evidence the victim had been hit or had fallen, causing injury to the back of the head. She said the victim had several additional areas of bruising on his back, chest, arms, and legs. She noted at least six injuries which were consistent with defensive wounds. She identified photographs of the victim's body taken during the autopsy and explained what they depicted.

Dr. Mileusnic-Polchan testified that the victim would not have been able to stand after the cervical vertebrae fractures occurred or after the injury to the vertebral artery. She said that if the victim had been hit with a beer bottle from a distance of one-half or sixth-tenths of one mile from where the body was found, he would have still been able to walk. When shown the boots previously identified as belonging to Mr. Hurst and asked about

them as having been involved in the infliction of the victim's injuries, she said she would not necessarily expect to find blood on the boots if they had been used to inflict a single kick but that she would expect blood if the boots had been used to inflict multiple kicks, especially if they had been used to inflict the blows that broke the orbital bone and caused the vertebral artery laceration. She said the vertebral artery laceration was consistent with a sudden hyperextension and twisting of the neck and was consistent with the victim's having been on the ground and having been kicked from the side.

Tommy Hurst testified for the defense that his niece, the Defendant, came to his house on Thanksgiving night 2015. He said his mother, his grandmother, and his grandmother's boyfriend were also at his house. When asked if anyone else came to his house that night, Mr. Hurst invoked his Fifth Amendment privilege.

Detective Duncan was recalled and testified that he and Officer Gary Ruszkowski interviewed Mr. Hurst, who waived his *Miranda* rights and provided a statement. The written statement, which was dated November 27, 2015, was received as an exhibit. Detective Duncan read the statement to the jury. In the statement, Mr. Hurst said the following: On the previous night around midnight or 1:00 a.m., he was awakened by the Defendant's beating on his window and screaming. He said he could tell she was scared. He said that he unlocked the door, that the Defendant ran inside, and that she screamed, "[H]e raped me, he raped me." Mr. Hurst said the Defendant held a set of keys and stated she had taken them "so he couldn't drive away." Mr. Hurst said he grabbed a jacket and opened the door to a man, whose forehead Mr. Hurst hit with his fist while Mr. Hurst thrust forward with his legs, causing the man to fly backwards. Mr. Hurst said that the man tried to get up and that Mr. Hurst began kicking the man because he thought about what the Defendant had said. Mr. Hurst said the Defendant and Ms. Partin also kicked the man. Mr. Hurst said, "The whole thing lasted five or six minutes until I caught myself when I realized they were going through his pockets. They got his billfold out of his pocket." Mr. Hurst said that during the assault, the Defendant hit the man with a broomstick. Mr. Hurst said he told the Defendant to stop because the man had "had enough." Mr. Hurst said he asked the Defendant and Ms. Partin "what was going on," that they did not respond, and that he realized the Defendant and Ms. Partin "played" him and that the Defendant had lied about the alleged rape. Mr. Hurst said that when he realized the women had "used" him to rob the man, he called the police. Mr. Hurst said he did not know the man's name.

After receiving the evidence, the jury found the Defendant guilty of first degree felony murder and second degree murder. The trial court imposed a life sentence for first degree murder. At a subsequent sentencing hearing, the court imposed a sentence of nineteen years for second degree murder and merged the conviction with the first degree murder conviction. This appeal followed.

-13-

# I

## Denial of Motion to Suppress

The Defendant contends that the trial court erred in denying her motion to suppress her pretrial statements made "during the course of several interviews" on the basis that she had been unlawfully seized in Kentucky before she gave the statements. The State contends that the Defendant has waived our consideration of this issue by failing to provide an adequate appellate record. The State contends, alternatively, that the Defendant is not entitled to relief because she failed to present any proof at the suppression hearing relative to the taking of her statement that was admitted at the trial.

Relative to the State's waiver argument, the Defendant, as the appellant, has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993).

Thus, we begin with a review of what the record does and does not contain. The record does not contain the motion to suppress. As we have stated, the trial court noted at the beginning of the suppression hearing that the Defendant's motion pertained to four statements she gave to law enforcement. The transcript of the suppression hearing reflects that the defense theorized that the statements were the "fruit of the poisonous tree" because they occurred after the Defendant was unlawfully seized by Deputy Laws when he went to Ms. Baird's house in Kentucky, brought the Defendant to Tennessee in a locked patrol SUV, and held her at Mr. Hurst's house until she was eventually interviewed. The evidence at the suppression hearing contained proof of a single statement – the one given to Captain Honeycutt in the presence of Deputy Henegar at the Clairfield Fire Department in the early morning hours of November 27, 2015. Deputy Henegar testified at the trial that he thought he was present when Captain Honeycutt advised the Defendant of her *Miranda* rights, and a written acknowledgment of those rights was received as an exhibit. The document reflects the following date and time notation: "11/26/15 4:14AM." We note that the relevant events are alleged to have occurred in the evening hours of November 26 and early morning hours of November 27, 2015, and based upon other evidence, we conclude that the document was erroneously dated November 26 and that the correct date was November 27. However, this statement was not admitted as evidence at the trial. Rather, the Defendant's statement given to Deputy Duncan at 5:30 p.m. on November 27 was received

-14-

as trial evidence. The 5:30 p.m. statement does not identify the location at which it was taken, and it is signed by Detective Duncan and the Defendant. The record does not contain evidence regarding the contents of any additional statements the Defendant may have given following Deputy Laws's retrieval of the Defendant at Ms. Baird's house. A timeline of events was introduced at the trial during Detective Duncan's testimony, but it has not been included in the appellate record.

Notwithstanding the absence of the motion to suppress from the record, we conclude that the record is sufficient for us to review the issue based upon the trial judge's recitation of the basis for the motion, the evidence offered at the suppression hearing and the trial, and the statement which was admitted at the trial. Because the 5:30 p.m. statement was the only one admitted at the trial, our review is limited to the question of whether the trial court should have suppressed this statement.

The Defendant argues in her brief, "[A]t the moment the detention of [the Defendant] started – while inside the sovereign boundary of the Commonwealth of Kentucky – it continued until arraignment in Criminal Court and setting of a reasonable bond, almost six months later." The Defendant has not provided a citation to the record to support her factual assertion that she was in continuous custody from the time Deputy Laws picked her up around 1:56 a.m. on November 27, 2015, until she gave the 5:30 p.m. statement later that day, which was her only statement admitted at the trial. Defense counsel stated at oral argument that the Defendant gave a series of statements at the fire department and was eventually transported to the Claiborne County Jail, where she was held for a few days, at which time an arrest warrant was issued. The record reflects that the Defendant was arrested by Detective Duncan on November 27, 2015, at 11:00 p.m., which was after the 5:30 p.m. statement, and that the arrest warrant was signed by a judge on November 30, 2015. However, the record does not contain evidence to support the factual assertion that the Defendant remained at the fire department after being transported there and gave multiple statements there before she was transported to the jail.

At oral argument, defense counsel focused on the Defendant's statement given to Captain Honeycutt "around 4:15 in the morning, two hours after she was illegally detained." As we have noted, this statement was not admitted at the trial. Counsel argued, as well, that the Defendant was in continuous custody from the time Deputy Laws picked her up at Ms. Baird's house until she was released on bond months later. Again, the record does not contain evidence to support this assertion. Rather, it is silent as to the Defendant's custodial status between the November 27, 2015 early morning statement and the statement given later that day, at 5:30 p.m.

Although the record reflects that the Defendant's suppression motion concerned four statements, she presented no evidence whatsoever regarding the circumstances attending the three statements other than the one given to Detective Honeycutt around 4:16

-15-

a.m. on November 27. This omission includes a lack of evidence regarding the 5:30 p.m. statement which was admitted at the trial. The record before this court likewise contains no evidence regarding the Defendant's whereabouts and any events which transpired between the 4:16 a.m. statement and the 5:30 p.m. statement. Arguments and recitations of fact by counsel are not evidence. *See, e.g.*, *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).

A defendant bears the burden of showing that she was in custody for *Miranda* purposes as a predicate to the State's burden to establish that a defendant's statement was freely and voluntarily made. *See State v. Joseph Moran*, --- S.W.3d ---, No. W2019-00837-CCA-R3-CD, 2020 WL 6375446, at \*6 (Tenn. Crim. App. Oct. 29, 2020), *perm. app. denied* (Tenn. Mar. 23, 2021). As applied to the facts of the present case, the record fails to reflect that the Defendant offered any evidence in the proceedings in the trial court regarding her custodial status at the time she made the 5:30 p.m. statement. The Defendant has not shown that the trial court erred in denying the motion to suppress the 5:30 p.m. statement.

## II

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her convictions of first degree felony murder and second degree murder. In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## A. First Degree Felony Murder

The Defendant was convicted of first degree felony murder committed in the perpetration of robbery. First degree felony murder is a "killing of another committed in the perpetration of or attempt to perpetrate . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (2018). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401 (2018). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a) (2018).

> "Knowing" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

§ 39-11-106(a)(20), (22) (2014) (subsequently amended).

Viewed in the light most favorable to the State, the evidence shows that the Defendant concocted a story about the victim's having attempted to rape her, which she told to Mr. Hurst. When the victim appeared at Mr. Hurst's house in Tennessee, Mr. Hurst, Ms. Partin, and the Defendant violently assaulted the victim. Mr. Hurst testified that he realized the Defendant had concocted the attempted rape allegation in order to deceive him into participating in the assault. Mr. Hurst said that Ms. Partin and the Defendant went through the victim's pockets during the assault at Mr. Hurst's house and that the women took the victim's wallet. After participating in the killing, the Defendant repeated the false allegation of an attempted sexual assault to Ms. Fuson in order to convince Ms. Fuson to call 9-1-1, and the Defendant repeated the allegation again when she encountered law enforcement officers. After Deputy Laws took the Defendant and Ms. Partin to Ms. Baird's house, the Defendant confessed to Ms. Baird that the Defendant and Ms. Partin planned to exchange sex for drugs with the victim but that they "all of a sudden" decided to rob and assault the victim. The Defendant told Ms. Baird that the Defendant and Ms. Partin took the victim's cell phone, keys, and wallet. The Defendant showed a set of keys to Ms. Baird and left them at Ms. Baird's house. The Defendant told Ms. Baird that the Defendant "done the final blow" and that a dead man was "out there." Ms. Baird's husband later took the keys to the police, who used them to move the victim's SUV. The Defendant admitted in her statement to Detective Duncan that she participated in the robbery and killing. From this evidence, a rational jury could conclude that the Defendant took the wallet from the victim by violence during the assault at Mr. Hurst's house and that the victim's death occurred during the perpetration of the robbery. The evidence is sufficient to support the Defendant's conviction of first degree felony murder.

-17-

As part of her challenge to the sufficiency of the evidence of the first degree felony murder conviction, the Defendant argues that the trial court erred in instructing the jury that robbery was a lesser included offense of first degree felony murder. Although we do not view an argument regarding an instructional error as impacting the question of the sufficiency of the evidence in this context, we will address it due to the Defendant's having raised it as part of her argument relative to the sufficiency of the evidence for first degree felony murder.

The lesser included offense issue is waived. The Defendant failed to raise it in the trial court by making a contemporaneous objection and failed to raise it in the motion for a new trial. *See* Tenn. R. App. P. 3(e), 36(a). Although the record reflects that the court instructed the jury that robbery was a lesser included offense of first degree felony murder, plain error relief is not required. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000); *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The Defendant was convicted of the greater offense, and the record reflects that the jury was instructed not to consider lesser included offenses unless it first acquitted her of the greater offense, in accord with Tennessee Pattern Instruction – Criminal 41.01 (Deliberation: Order of consideration).

The evidence is sufficient to support the Defendant's conviction of first degree felony murder. She is not entitled to relief on this basis.

## B. Second Degree Murder

Finally, the Defendant argues that the evidence is insufficient to support her second degree murder conviction. As relevant to this appeal, "Second degree murder is . . . [a] knowing killing of another[.]" T.C.A. § 39-13-210(a)(1) (2014) (subsequently amended).

In her argument, the Defendant challenges witness credibility and claims a lack of physical evidence of the homicide on Defendant's clothing and shoes. It is not the function of this court to reweigh the evidence and revisit questions of witness credibility. *See Bland*, 958 S.W.2d at 659; *see Sheffield*, 676 S.W.2d at 547.

Viewing the evidence in the light most favorable to the State, the record reflects that the Defendant participated in a violent assault on the victim and that she and the other perpetrators inflicted at least thirty-seven blows over much of the victim's body. The Defendant told Detective Duncan that either she or Mr. Hurst killed the victim. The nature of the assault was such that a rational jury could conclude that the Defendant was aware her conduct was reasonably certain to cause the victim's death. The victim admitted to Ms. Baird that she "done the final blow." The victim admitted in her statement to Detective Duncan that she participated in the killing by beating and kicking the victim.

The evidence is sufficient to support the second degree murder conviction. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE